May it please the Court, Lee Crawford Boyd, I represent the individual Bakalian appellants and appellees. Forty years ago, the political branches, Congress, along with the State Department, exercised their powers under the Constitution and Foreign Affairs to delegate to the courts all questions of when a foreign sovereign can be sued and the types of cases they can be sued for in courts of the United States when they passed the 1976 FSIA. The court below, for the first time, as no other court has done, obviated that delegation by applying the political question doctrine to send back to the political branches the very question that had been delegated in the Foreign Sovereign Immunities Act of 1976. And in that way, she erred and should be reversed. In principle, there's nothing wrong with that, right? I mean, you know, something may be within our jurisdiction, but if it is a political question or a mood question or a hypothetical question, you know, all those doctrines still apply. Those are limitations on our authority that supersede any statute, right? In principle, there is something very wrong with it. No political question doctrine has ever been applied by any court to the jurisdictional inquiry under Foreign Sovereign Immunities Act. The fact that no court has ever done it, as you claim, doesn't mean there's anything wrong with it in principle. There is something wrong with it. I don't understand how we can transgress the normal limits on our article of free authority. If something is a political question, it's a political question, and we don't have authority to deal with it, no matter what. The political question addresses the separation of powers between the branches. The policy decision made during the 1976 FSIA and applied for the past 40 years was made in that statute, and that statute in the legislative history to the preamble to all courts after that in Berlin have said that the courts, the Article III courts and the state courts must apply these principles, and they must decide the questions of sovereign immunity in U.S. courts. Your Honor, they did that, as it states in the legislative history, to obviate the political pressures on the State Department at that time that were being placed by diplomats. And they didn't want to have those questions before them. And today, as we stand here, there's no indication that they've changed their mind about that delegation of power. And as Justice Kennedy in Altman stated, it would be constitutionally problematic for this court to, in a sense, constitutional hopitate, to send this question of jurisdictional inquiry of when a sovereign can be sued in the United States courts back to the political branches in light of the FSIA jurisdictional inquiry, which has been mandated by statute and by policy to be the courts. So your position is that the FSIA does away with the political question doctrine? The FSIA does away with the political question doctrine. You don't have to restate the question. Only in the jurisdictional inquiry, Your Honor, but not as it applies to the claims. Political question doctrine, as this court said in Alfred, should be applied to the claims. What good does it do if you have a political question down the road? What good does it do for a social jurisdiction? Isn't it exactly the same question? I mean, this is a political question now. It's going to have to be a political question later, right? No, Your Honor. It's very different, and this court has stated that in Alperin, and Altman understood it, too. The jurisdictional inquiry, that was a policy decision constitutionally exercised in 1976 and codified in the statute that said courts must decide questions of international foreign sovereign immunity under the standards set forth in that statute. That was decided, and it cannot be sent back to the political questions in the absence. I don't understand that. I mean, I kind of suggest to Sinckey's question that maybe he and I are misunderstanding you. You were suggesting that after you decide the question of jurisdiction, that then when you get to the merits of the case later after you pass jurisdiction, you could then apply the political question doctrine. Is that right or not? Yes, Your Honor, and if you have me explain. What's the difference? Because, Your Honor, as we said in Alperin, the question of foreign sovereign immunity, that question, that jurisdictional question is not, it must be adjudicated by the courts. That was a political decision made by the political branches in 1976. That's been decided, and within the absence of any contrary policy, that for some reason the courts, the statement of interest or the, excuse me, the executive does not want the courts to hear that question. You have to follow the mandate. I hear you going into automatic pilot. You're not listening to the question. You know, it's sort of like you load in an answer, a pre-programmed answer, and off you go. The question— Let's put it simply. Let's assume we said yes to this jurisdiction. Now, the first question we'll take up is should we apply the political question doctrine. That would be okay? To the claims brought. If the claims require the court to adjudicate a political question, then the Baker factors have to be gone through and a search warrant. We know that they will because they raised it. Isn't it exactly the same claim in the next step? Exactly the same inquiry. If the court had gone through the Baker v. Carr factors on the claims that were brought, the property claims, is it likened to the case of Alperin? Why don't we just do that now? We can do it, right? We have the claims. Why don't we apply the Baker factors now? Yes, Your Honor, and I would submit that they would be applied— There's another question of not having a political question doctrine. The question is how does Baker apply? Two separate questions of whether there's immunity. I submit that it was improper to apply the political question doctrine absent some indication from the executive that they wish to undelegate that power. To the question of adjudication of claims, you're right. We could apply it today. That's one of the questions I was going to ask you. Any reason not to ask the executive what their position is on this case? There is no reason to. Is there any reason not to? There's no reason not to, and I submit there's no reason to do it. As I understand the record, somebody, perhaps it was you, did send a letter to the State Department. Yes, Your Honor, that is in the record, and I can also test that I've spoken to them face-to-face and the State Department on this case and indeed invited them to this hearing. I'm not sure they're here, but they have not made their views— They are everywhere. They are everywhere. I do not doubt that, Your Honor. But they have not made their views known to the court, at least as far as I know, and I think that's significant when applying the political question doctrine. It was significant in Alperin, and it's significant also— Do you have any e-mails for the State Department? I do have e-mails, but we're only scheduling our meeting. And they are well aware of this, and the Foreign Sovereign Immunities Act was to give the State Department a break from these types of questions and the political pressures of the diplomats. And so here today—and I do want to allow my colleague— Let me push Judge Reinhart's question one step further. Wouldn't it be the wise thing for us to do? Presumably they're going to be more responsive to a query from us than from you. Wouldn't it be the wise thing, since this is a matter that at least obliquely implicates our interest in foreign affairs, to give the State Department a chance to speak? No, I don't think so. In questions of the Foreign Sovereign Immunities Act, they've spoken. These are just the types of claims, property claims, takings in violation of international law, that they want this court to hear, and that they've delegated it in the Foreign Sovereign. Furthermore, I don't think it's— Justice Kennedy, in the Foreign Sovereign Immunities Act, said even if the executive were to give— He was in Altman. You said in the Foreign Sovereign Immunities Act. Yes. You mean Justice Kennedy in Altman? Even if there were a statement of interest, it would not necessarily be something we would defer to, the courts would defer to, because these are questions that are specifically under the federal powers given to and delegated to the courts under the international law standards. In Altman, the government did come in and file amicus briefs, both I think at the Court of Appeals level and the Supreme Court level, on the side of the Republic of Austria. And they were considered, but they were not deferred to by the court. And I suggest that they wouldn't have to be deferred to here, because there is no conflict here with—none of our claims, which are pure property claims, require any finding of an Armenian genocide. Why don't we just—let's separate out—let's discuss the Foreign Sovereign Immunities Act and let's talk about the appropriations exception that was found here. Yes, ma'am. Isn't it true that if you want to assert or invoke the appropriations exception, you can't do so on behalf of citizens of the state that has taken the property unless you find genocide or some other violation of international law? I would agree with that. In fact, the court in Seventh Circuit and the D.C. Circuit have done that. And do you see that that could be why Judge M.G. thought she had to consider the political question issue before she made a determination as to whether the Ottoman Republic had committed genocide? She rightly decided that there was a violation of international law. And we asked you to affirm that. That's why we're a cross—appellee. She did that. Just a minute. You just said that we don't have to reach the question of whether there was genocide? Not in the claims, Your Honor. Only at the level—and you don't even really have to reach it on the level of international law violation, although Simon did that, the D.C. Circuit this year, and Abelez in the Seventh Circuit. But you're saying in this case we need not reach the question of whether there was a genocide. No, I absolutely say that, Your Honor, because the legislative history in international law says discriminatory taking without just compensation is an international law violation. That was all we needed to plead. However, we can also, in this court, can decide, because you've done so in Saray, that there was an international law violation and a genocidal taking. That's within your purview, and it's not a political question. It's a legal question, which belongs in the jurisdictional inquiry of the FSIA. Our claims, Your Honor, when I'm presenting my case to a jury, do not bring up Armenian genocide at all or genocide. They're mere property claims that are the backdrop of wartime. However, as Judge McKeon said in Alperin, claims for property, stolen property, merely because they happened during the backdrop of war, do not necessarily make a political question. And in this case, they don't make a political question. They are property claims. I'm sorry, I'm still trying to understand why you think this case can be decided without deciding the genocide question. Well, Your Honor, I looked at the elements of my claims, and I bring only property claims. Well, but they say, look, we are entitled not to be in court because this was an expropriation by a sovereign of its own citizens' property. That's not an international law violation, and I submit to you that If you let me finish my question, you may be able to answer it. Yes, Your Honor. I know you disagree with me. You think I, when I say they say this, I'm saying, do you agree with that? You think I believe that? I assume you know I don't agree. I'm sorry? I assume you know I do not agree. So you thought it important to cut me off to let me know that, right? That was wrong of me, Your Honor. It was. You weren't listening. I'm listening. Are you sure? Yes, Your Honor, absolutely. Okay, just listen. They say we're entitled not to be here because this is what you have claimed, an expropriation by a sovereign of the property of its own citizens. And that is an exception. There's no claim for that. You can't get a claim, a relief for that. That's what they say. So you have to come back with something else and saying it falls with an exception to that exception. A violation of international law of norms is one of them. Genocide is another one, right? Yes. So I don't understand how you can get past deciding those two questions. We must decide them under the international law exception. Well, let's see you lose on that. I don't have to prove them. Let's say you lose on international law norms. How do we decide that? How does the court, how does the federal court decide this without deciding the genocide question? Your Honor, at the FSIA, You can drop it, Your Honor. Just give me an answer. Non-frivolous and substantial allegations are all I have to show for jurisdiction. For my claims, I have to prove them. I say potato and you say potado. I asked you a question and I would like an answer. I don't want to hear your jurisdiction. How do we get, I mean your answer was you never have to reach the question of genocide. And I'm trying to figure out how you can say that if they have a defense and they say we are entitled not to be here because this was a simple expropriation of a citizen's property by its own government. So you then have to, in order to, if we follow the Seventh Circuit, you then have to show that one of the exceptions applies. We pled the exception, which was it was an arbitrary, discriminatory, genocidal even taking. So that has to be decided, right? Along the way, somewhere that will have to be decided. At the jurisdictional stage, a non-frivolous, substantial allegation. Eventually, this will have to be decided before you can get to judgment. At the jurisdictional stage, yes, Your Honor. Absolutely. So why wasn't Judge Gee right by saying, since this is a case that requires the courts to rule on whether this was genocide, this is a political question and this is something that we ought not to be deciding? Because the political branches have specifically expressly given that question to the Article III courts and to state courts under the FSIA. Your position is that even if we conclude that we'd be required to decide the genocide question, it's fine. We have authority to do that. As the Seventh Circuit and D.C. Circuit have done, yes, sir. They have applied it under the FSIA in the Simon case and under the FSIA in the Abaleth case, and they found that takings during the Holocaust violated international law for the jurisdictional purposes. The claims underlying them were not for genocide, and ours aren't either, nor are they for human rights violations. They are for property. Well, the question of whether takings during the Holocaust were as a result of genocide are not really politically controversial, whereas this is, for better or for worse, our government has resisted calling this a genocide. Would you agree with it or not? A lot of people I know disagree with that, but our government has been quite adamant, as best I can tell, that this is not a genocide. Well, Your Honor, number one, for the political question doctrine, they have not made that position known in this case, that they would not want the courts to make this decision under FSIA because they have not made an exception for Turkey or for the Armenian genocide in the interpretation of the FSIA. There is no indication in any case or from an executive amicus brief, as there's been in other cases, or in any statement of interest that there is an exception for the Armenian genocide above all other international law violations in Africa. May I ask you a question here? Did you make an agreement with your co-counsel? I did, Your Honor, and we asked for more time because... No, I didn't ask you whether you asked for more time. What agreement did you make with your co-counsel about splitting the time between... Half. What? Half and half. Half an hour? Half and half. Half and half. Yes. Well, I think you're not going to comply with that, but we do want to give you a co-counsel. I would appreciate it if you would give him half time, especially to address... Well, I know you would appreciate it, but I said you're not going to get that. Okay. So please be seated. Thank you. I appreciate that. That was coming out of my skin. In response to... Good morning. In response to Judge... Do you want to identify yourself? Mark Garagos, G-E-R-A-G-O-S for Du Bois. In response, yes, you can always do the political question. You can do it now or you can do it later. It doesn't matter when you do it. The question is not whether we can. The question is whether we have to. No, you don't have to, but certainly I think when you set it up... I guess you didn't understand the question. The question is, don't we in fact have to do it? Isn't it required in this case if we're going to go forward? Ultimately, yes. Okay, so that's the answer. So if that is the case, wouldn't we then have to take... We, the federal courts, have to take a position that is possibly contrary to the position that has been adhered to by our government for... the executive branch of our government for decades. Well, first of all, it hasn't been for decades, so that it's clear. Both Congress twice and President Reagan both called it a genocide. So it has not... This is a recent phenomena. Believe it or not, President Reagan hasn't been president for... For about 30 years. Yes, but the problem... Which is decades, you know. I hate to... I haven't been appointed by President Reagan. I really hate the thought of it, but it is decades. But the fact remains, and I think this is where the problem lies, we keep saying, or we keep saying genocide, genocide, the G word, which is... Two of the three of you were there for the in-bank on the Mosesian case. That was specifically went to whether the word genocide was used. As was in the paperwork, and if you take a look, President Obama, all eight times that he's had the opportunity, or seven times he's had the opportunity to comment on April 24th, has actually used the Armenian word, medgergan, which is great calamity. Before we get to the merits of it, let me ask you one question. I understood you to say that at some point during this case, we would have to decide whether there was genocide. No. No. I was answering Judge Kaczynski's question. I'm sorry, are you going to give him a different answer than you gave me? No, I didn't say genocide. You think he wasn't listening? No, I said... He and I... I was responding to him. No, I don't think you have to decide genocide. Yes, you have to decide international law. Okay. And so you think that this can be based on international law principles, other than genocide? Correct. And we don't have to get to genocide. And what if you lose on that one? What if I lose on that? Then we go back up to the 1605 factors. No, no, if you lose any other principles of international law, you're not waiving genocide. I'm not waiving genocide. So then you would have to get to genocide if you lost on the other international law principles. Yes, if I lost on commercial activity under 1605, if I lost on all of the international law violations, whether it's torture, whether it's mass deportation, whether it's expropriation, and then genocide was the only international law violation left, yes, hypothetically, of course. But if we got to that point, then the analysis could be political question at that point. We don't have to get that far. You're not going to get to it that way. We're not going to give you rulings as you go along. You lose on issue one, you lose on issue two, you lose on issue three. Correct, but I would assume I do it all at the same hearing. All at the same hearing. Correct. I get a hearing. I get to prove international law violations. I'm not asking you to. You may know what Judge Honhoff was about to ask, but I wasn't sure, so you cut him off in the middle, so I don't know what it is you're answering. Well, I think you're giving me the answer that I would have gotten. At one hearing, you're going to raise genocide as part of your international law defense. It's part of your claim. You have a claim for human rights violations in your complaint. Right. So that would definitely be something that was being litigated. Correct. If we let this go forward. We absolutely would litigate international law violations, which as a subset, genocide is in there. We have that before us, right? And if we decide there is no international law violation except possibly genocide, then you're stuck with genocide. And expropriation doesn't work for you, because there's an exception for expropriation of citizens' poverty by its own government. Except for genocide, right? No. The other is if the citizens have been effectively stripped, which is what Judge Gee said that that suggestion was made at the trial court level, that also is an exception. So you do not have to default. If the citizens of the sovereign have been effectively stripped of their citizenship, that in and of itself would prevent you from going where you keep asking me hypothetically to go, which is to genocide. Why don't you talk about that? I mean, I saw that argument. I wasn't persuaded by it, but why don't you go ahead and persuade me? How were they stripped of their citizenship? What evidence of that? Well, by the laws that were enacted, both in 1920 and 1923, when the new regime came in, the new regime took away all rights, including voting rights and everything else. There were specific decrees that would have, in fact, both treaties that were entered into, Turkey did not become, I think in 1918 and 1923, Turkey did not become signatories to, that would have absolved them of specifically that one point, which would have given some kind of reparations to Armenians as citizens. They did not become a signatory to it because their laws enacted at the time specifically said that they were not. So all of that is great, but we didn't get to the point where we could flesh this out at the trial court level. And what I was going to say in response to your question originally, the hypothetical was, when you say if we have to get there eventually, yes, I agree. But for purposes of this motion, we assume the facts are true. So we get over that hurdle. And then once we have jurisdiction, then we have the plenary or the full-blown hearing. And then at the full-blown hearing, I get to put on evidence. I get to show Ambassador Morgenthau's missives to the State Department. I get to show that the government of Turkey not only expropriated this property, but then came to the U.S. and went to the Secretary of State and said, we want to now take the Armenians' property here in America, namely life insurance policies, namely the property damage policies that were issued by insurance companies based in America that were insuring subjects in the Ottoman Empire. Turkey actually came here. So there is a connected to portion of this in economic or commercial activity. Okay. We get past all of that. Why isn't this claim late? Why is it waived? A hundred years later? It's 40 years after the FSA was passed, right? So it's not like you guys immediately jumped the first chance to bring suit. Why isn't it barred by statute of limitations or latches? I went through, because I had the same thought. In fact, last night I went and read a couple of surveys of it, including one from the Federal Judicial Center, and all I can see is that there is no SOL, there is no statute of limitations, when you're specifically doing the FSIA. So barring that, I don't know. I had the same question. Because when we were talking about Lecessian, that was in the context of an extended statute of limitations. We don't have that here. Why wouldn't we apply the six-year statute of limitations that's applicable to taking these claims against the United States? If you have a taking a claim against the U.S., six years. Why wouldn't we apply that as an analogous statute of limitations? I'm not aware of any claim that exists out there that has no statute of limitations. I'm certainly aware of no claim that's not barred by latches, where the doctrine of latches doesn't apply. Why aren't you at least 40 years too late? Well, I don't know that there is a good answer to that, other than to tell you there is no statute of limitations, and Congress did not enact it. And most of the suggestions— Wouldn't you apply the statute of limitations applicable to takings of property in Turkey? To taking of properties in Turkey? No, because I think precisely that's what the FSIA is saying no. No, I think that we actually, in Altman, said the other way. We said it applied, but in Altman, they were only able to discover their claim with a 20-year statute of limitations. They were only able to discover their claim in 1999 due to the actions of the Austrian government in deceiving them. So we said that it's within the 20-year statute of limitations. So wouldn't we look to Turkey? If we applied the Turkish statute of limitations, or if we took Judge Kaczynski's suggestion and applied or imported the U.S., we still would be within the statute of limitations. Turkey has taken and expropriated property within the last six years. Churches, they've taken actually St. Gyragos within the last seven months. So there are claims that have come clearly within the last seven or eight months. So we could fit ourselves into that. The problem is, doing this at the appellate level, is that you ask great questions, and these are spectacular questions and the things that we struggle with. They're spectacular. Well, I give you spectacular. It's the end of the day, and I put my foot down. They're pretty obvious questions. I had thought that you were not basing it on the seizures so much as you were basing it on the failure to give an accounting, on the failure to perform with the trust, and that that, I guess, is a continuing violation. Those were the answers I expected. At least they weren't spectacular answers. Thank you. I'll take that. It wasn't a compliment. I know it was not a compliment. I said I'd take it. He also said thank you, so I'm a little confused. Maybe you thought it was a compliment. No. I know a gratuitous slam when I hear one. The fact remains that when you take the property, whatever dividends, whatever rents, whatever accrues, and you demand the accounting and you demand a constructive trust, that is ongoing. So once that happens, obviously, if somebody was paying rent on the church or on a building or on an Air Force base two years ago and Turkey hadn't taken it, then there's nothing to complain about. Once they take it, once they take the property, once they expropriate it, the rent that's due, the accounting that's due, that ripens and puts you under the statute of limitations. Going back to my not-so-spectacular answer. So your answer is that you can now go back 100 years because you didn't get accounting last year? Well, I don't know why it isn't ongoing. I mean, it would be like an open book account. Well, you can get accounting, but you wouldn't get the money. You might say I won the interest for the last six years. Correct. Similarly to an open book account, if you say I want an accounting and they give you an accounting, you're entitled to the interest, all they do is cut off. If there's a statute of limitations problem, all that does is take your 100 years minus the 94 and give you the last six. You're still in it. They've still got it. They're still taking the money. They're still sending it here to the ministry. They're still using it for the Bureau of Tourism. They're still mixing it with the central bank. They're still putting it with Turkish Airlines. They're still flying in here and flying out. I mean, my response would be the accounting would still cover any of the acts that are done within the statute of limitations. Okay. This is all maybe an argument about why you wouldn't resolve that question during the jurisdictional inquiry, which I think that she didn't do. But I don't know. Certainly if you were going to rely exclusively on the political question, it would seem to be part of the jurisdiction. But do you have anything further you would like to add? Well, just in this sense, I think what's happened. I have a question. Okay. So in thinking about the Baker factors and thinking about down the line, even with respect to the property claims, in doing an analysis of the political question doctrine, what weight would we give to the current situation in Turkey and the fact that the United States is their partner in defense, that they're occupying the very land that you want returned to you and that we have this crazy president over there right now who. We don't have one here yet. I mean, we have this president who goes, you know, who reacts terribly to any suggestion that this is going. I mean, do we just put blinders on to the real world events? No, I wouldn't. But I think, and I thank you for the question. The problem is when we keep saying we're using Armenian genocide as kind of a talisman here to conflate. All we're talking about here is there has to be everything that drives, as you characterize it, the crazy president in Turkey is the G word. That's it. He accepts everything that Barack Obama says every April 24th. He lives with that. He doesn't pull his ambassador back. The only time he pulls his ambassador out of the country, out of Germany or France, is when they use genocide. That's it. That's the magic word. If you don't use genocide, if you say Meds Järgen like Barack Obama does, if you talk about 1.5 million like Barack Obama does every year, if you talk about the atrocities, which is what he says, the violations of international law, apparently that is fine. The fact remains, though, and the problem is, we've taken Mosesian, and I think we have taken it exponentially. Mosesian's ruling was specifically that the state, California, couldn't import the term Armenian genocide because it was preempted by the executive. That was all it stated. It didn't say anything more than that. And what's happened here is we've gotten to the point where we've almost exaggerated what that means. It doesn't mean you can't utter Armenian genocide. It's not like in France where the denial of Armenian genocide is a crime. The FSIA specifically says let the court decide. Congress, in fact, your strict holding in Mosesian was it's a federal issue. It didn't say it's only the executive. It didn't say it's only the legislative. It said it's part of what the national government is supposed to do. The federal courts are part of the national government. If the State Department comes in and says this is going to cause this, that, or the other thing, and that's a political question, then does the FSIA become, I guess my question would be are we declaring the FSIA unconstitutional? We've declared other statutes unconstitutional, so I don't see. But we don't have to do that. All claims are subject to the normal constraints of all the three courts, mootness, political, all these. Those are limitations on our power. The more you talk, the more I'm convinced that the genocidal question is at the heart of the claim because if it weren't, you would have been disowned by now. You would have just said I waive any claim based on that. And since you say it's only a word, it's no big deal, you would have said, listen, we disown any, we give up any claim to reliance on genocide. And then you would take the question off the table and it wouldn't be implicated. But you haven't done that. Co-counsel hasn't done that. So I'm convinced that this must be pretty important. Well, actually, there's two cases. Bakalyan, which is co-counsel, does not have a genocidal claim. Ah. Okay? Davoyan does have a genocidal claim. So actually, that hypothetical doesn't ring true, number one. Number two, if you're going to say that genocide is a political question because there's nothing that says it's just Armenian, if you're going to say that, then the FSIA, what you're saying is that it's, at its heart, unconstitutional, which I don't think that it is. No, in the first place, the question is not whether genocide is an exception. The question is whether what happened to the Armenians in Turkey qualifies as genocide. Only if that's the only thing that I'm hanging my head over. Judge Kaczynski says, I'm not disowning it. Why would I? If you wanted to remove the issue altogether and say, look, you don't have to decide it. The court doesn't have to decide it. You can just say, we disown it. And then it would be clear. The fact that you keep sort of talking around it, that you don't do it, tells me it's pretty important. And at some point, there's something that's going to have to be decided. Which means we have to decide right now whether it is okay for the federal courts to decide that question. No, we don't need to. That's what I'm saying. Well, that's your view, but I'm not convinced of that. If you really thought we didn't need to, you'd say, we disown it. I just said, we don't need to. You can remand for a hearing on whether there's international law violations. At some point, we'd have to decide it. Not if I say I'm willing to stand on international law violations that exclude Armenian genocide. Then disown genocide. What? I'm not disowning it. You are saying that you are disowning it as far as this lawsuit. As far as this lawsuit, I can proceed on international law violations without having to own genocide. Absolutely, I can do that. You can, but you haven't done it. You haven't said, look, I proceed on those theories only. I give up in this lawsuit the claim that there was genocide. You haven't done that. You're asking me would I do it? Remand down for international law violations, and I will not proceed on the genocide claim. But you've still got the Bakalyan case, which doesn't have that claim. So if you're going to reverse, or if you're going to affirm, you can only affirm on Du Bois, and you can't affirm on Bakalyan, because Bakalyan doesn't make that claim. All right, well, I didn't understand that previously. We'll ask your co-counsel on that. But you say you are willing to abandon the claim of Armenian genocide for purposes of this lawsuit. That's exactly what I'm saying, and I'm willing to proceed on international law violations, which is the pathway towards the proceeding on the expropriation, which is precisely where Judge G's order left off at. Absolutely. I don't think that that's – I apologize if you thought that that was the essence of the lawsuit. It is not. The essence of the lawsuit is the international law violation. Well, I thought that you were proceeding on both theories, international law violation and genocide, which I thought international law theory includes genocide, actually. It does. It's a subset. And now I hear you saying you disown genocide as part of international law theory. For purposes of – to moot the political question if that's where the court is. Nothing is not practical. I'm not going to insist on it. There's no if. We're not bargaining with you here. We're asking you whether or not you're giving that up. If you say you are, you are. We'll take that into account in making a decision. Yes, I've said it twice. I'll say it a third time unequivocally, yes. Okay. All right. Thank you. Let's save this for one minute from your co-counsel. Is it correct that your claim does not involve a claim of Armenian genocide? Correct, John. The only inquiry is jurisdictional international law violation. I mean, I don't mean just for jurisdictional purposes. There is no claim for genocide or any other human rights violation. There's claims for property that would be – How do you get around the domestic takings bar to the expropriations exception? Your Honor, I would disagree that there's a domestic takings bar when it comes to takings that are alleged in this complaint and in the Du Bois complaint. This Court has never held that a taking during a massacre that is discriminatory across a group or genocide is – they're not mutually exclusive is what I'm saying. Domestic takings applied because the facts before the Honor in Altman and Kassir did have that element, but it wasn't required for an international law violation as Judge Kaczynski has said. The courts, for example, in Simon and in Avales have recognized, and even Judge Gee, that a taking during the commission of a mass discriminatory crimes against humanity does also violate international law, and nothing in the legislative history of the FSIA indicates domestic takings rule. In fact, it says in Cederman, this Court said, international law violation, a taking in violation of international law includes a discriminatory taking, one without just compensation, and an arbitrary taking. And we wouldn't even have this – non-Armenians could obviously bring property claims against Turkey for arbitrary and discriminatory takings under the jurisdictional inquiry. And, Your Honor – I'm sorry, I got lost there. You said any arbitrary taking violates international law? Mrs. Kilo, who has her house taken, Little Pink House, taken by New Haven or New Canaan, would become an international law violation because it was arbitrary? You remember that case in the Supreme Court? No, probably not. It was a question of whether that was a public use, taking for public use. The Little Pink House was taken so they could do a development in Connecticut, and she claimed that this is not permitted. You can't take this property and give it to a corporation to develop because that's not a public use. That was the argument. You would turn that into an international claim, into an international law violation. No, I would not turn that into an international law violation. Because it's not your client. Well, no, Your Honor, there's other reasons. Conceptually, a discriminatory taking that is in violation of international law has to follow certain use code and norms that are crimes against humanity. Well, just being arbitrary is not going to be enough, is it? The legislative history states arbitrary and discriminatory. So I agree. I don't think arbitrary is enough, and without just compensation. So we would have to prove that this was a discriminatory taking for jurisdictional purposes as opposed for the FSIA, as opposed to our claims. Our claims are pure property claims under unfair, unjust enrichment, accounting, constructive trust, and the like. State law claims, like they were in Alperin. And the Corey case before this court did, and the point I was trying to make, and I believe my counsel, too, is they did discriminate between the jurisdictional question and justiciability. Justiciability applies to claims. So I do disagree, and the point we're making is that the political question doctrine applied to jurisdictional inquiry has never been done because the policy question was decided in the FSIA. Absent the executive branch saying there's a carve-out for certain types of international law violations, including genocide or Armenian genocide, this court can't create such a carve-out using the political question doctrine. Thank you. Thank you. Good morning. May it please the Court. Neal Saltman of Mayor Brown for the Bank Defendants' Appellees Cross-Appellancy. I think we have to start back at phase one. First point I think worth making, given the argument we heard, is that there are 24 references to genocide in the Bakalian complaint. Twenty-four in the Bakalian complaint. Twenty-four. This case has always been about genocide, and the reason it is always about genocide— It stopped today. I'm sorry? It stopped today. You won a victory even without standing up and talking. They have just disowned it. I'm not sure that the second—I guess it's a Bakalian case. It crept back into the answers. It's not as clear as Mr. Garagos. And I think there's a reason for that. That is, what you just heard was an argument that says, we don't need genocide because we have arbitrary and discriminatory takings. And I think, Judge Kaczynski, you were on the point when you talked about what happened in Connecticut. Arbitrary and discriminatory takings, any kind of taking that occurs overseas between a government and its citizens, is part of the domestic takings exception. No excuse for that, no exception to that. That is what the domestic takings exception is and always has been. So I understand that is your argument. We would then have to break with the Seventh Circuit, right? Yes. Well, I think what you have to do is say where this circuit has always been. There are four domestic— After the D.C. circuit. Seventh and D.C. versus this circuit, the Fifth and the Eleventh. No, there's no debate about that, except let's look where this circuit has been. There are four domestic takings cases, two of them involving the Holocaust, and in all of those cases, including the most recent one, which was en banc, the domestic takings exception was just an accepted proposition. It was so well established that it was dropped into a footnote and no one was arguing it. But this circuit has never— You know, when you say that, it sounds to me like the question wasn't decided. It had been decided before. I'm sorry? That is, what the footnote says, we don't need to deal with this because— So which of our cases stands squarely for the proposition that the domestic taking exception doesn't have any exceptions? The Seidermann-DeBlake. Seidermann-DeBlake, the Argentina case. The what? The Argentina case. Seidermann? Yes. At least, I think that's how it's pronounced. S-I-D-E-R-M-A-N. In 1992. That's a little difficult to understand. I must spend more time with it. But at one point, it distinguishes the lady at the end, who I think was an American, from the family that was in Argentina. Well, I think that was Altman, where the woman was. Now a U.S. citizen. There were about four people in Seidermann. Three, they said, were citizens of Argentina, and therefore they said they were not covered because there's a domestic exception. And then they went on and said the fourth was, who I believe was an American, their relative. But then later on in the opinion, it seems to apply to everybody, and make everybody eligible for recovery. The opinion's somewhat confusing on what they actually did in that case. And unfortunately, when it was returned, it was settled, so it didn't go very far. Well, and, for example, it comes up in Altman again, and the Supreme Court in Altman, Justices Breyer and Souter, in a concurrence, described the domestic takings rule as the consensus view among the courts. It had been adopted in the Fifth Circuit in DeSantos. But nobody disagrees that there is such a rule. Right. The question is whether the rule has exceptions. Yes. So if a state wants to, you know, Germany or France or England, wants to expropriate somebody's, I'm sorry, use essentially eminent domain to take somebody's property, and the payment is inadequate or whatever, that is not something that is covered by the FSA, right? Right. But if they say, we're going to take everybody of African descent, and we're going to take all of their property, you know, there's not going to be a genocide or anything like that. We're just going to see everybody who is of African descent, I mean basically black. And if you are black and you own property, we're going to take it from you and give you no compensation. Now that would be an exception. That would be different from your run-of-the-mill. It might or might not be an exception. Can a country have two classes of citizens, two castes, for instance? Like the castes we've had in Hindu countries. Can they do that, or is that a violation of international law that we would use to change the domestic exception? Well, I don't want to suggest that I'm schooled on that particular issue, but the domestic takings rule does cover generally, and this is a matter of policy and a matter of what courts have thought is wise policy, we stay out of their business because we want them to stay out of our business. Yes, but we didn't do it with the Holocaust, the real Holocaust. We didn't do it. At least the Seventh Circuit and the D.C. Circuit haven't. Well, and let me talk to that. This court hasn't done it, and obviously other courts have rejected the Holocaust exception, but let's look at it in this particular circumstance. These events occurred in 1915. The statute, the FSIA, which we're talking about whether there's an exception for, uses the phrase, taken in violation of international law. When you use that phrase, plain meaning of English is that it was in violation of international law at the time of the taking. That's step one. Everybody agrees, including the majority opinion in Simon, Judge Srinvasan in Simon, agrees that things changed in the 40s, that the international law world with regard to genocide and things of that sort were changed as a result of the Holocaust. Everybody agrees that that was the dividing line. Everyone agrees that the Holocaust was not contrary to international law? No, everybody agrees that it was. What, at the time it occurred? At the time it occurred, in the 40s. But what there is no debate about that I've ever seen is that international law violations are measured at the time they occur, and the FSIA incorporates that in the phrase I just quoted. Don't you think if the Holocaust had occurred in 1915, it would not have been contrary to international law? I don't think we have to talk about the Holocaust because there's a different issue with the Holocaust. We don't have to except that I asked you the question. Yes, okay. Well, the answer in the Holocaust, one of the reasons it is a different circumstance is because the Holocaust is not a debatable, this gets to the political question, is no longer a debatable issue. No, but as of 1915, was it a violation of international law? The concept didn't exist as of 1915, and the answer was nobody would know what you were talking about in 1915 if you talked about genocide. The concept didn't exist, according to you, in 1940 until we realized it after it had occurred. But everybody does agree, including the two cases, we're only talking about two cases, including the two cases that say the Holocaust is an exception, start with the Holocaust. They don't start with anything before the Holocaust. Bad stuff, I assure you, we all know, happened before the Holocaust for the last 2,000 years. The issue is in construing this. And don't even get me started about the Egyptians. That's right. Me too. Right, I meant the old Egyptians. Yeah, the old Egyptians, that's right. And I think, you know, we're all engaged in drawing lines, right? There is a line with regard to the Holocaust, which is undebatable. There is no legitimate debate over whether it occurred. And there is also a line, according to Judge Sinvasian, there's a quote in there, this was recognized in the 40s. That's clearly true. There are reasons why. You're saying this was recognized for the first time in the 40s? Yes. Or that it was recognized in the 40s? It was recognized for the first time in the 40s. He has a line in the opinion that says, this all changed in the 1940s. And then he goes on to explain why the Holocaust is different than anything else, and why he is carving an exception to it. Let me see if I can get you back to, sort of veered off a little bit. You were making an argument that said, there are no exceptions to the domestic takings, the domestic creation exception in the Ninth Circuit. Correct. Some circuits have an exception, the Ninth Circuit doesn't have it. Yes. And we then started talking about, I think you gave an example, Mrs. Kilo, which is an example I gave. And what I was trying to point out is that, just the taking of one individual, you know, good reasons or bad, is different from saying, a government saying, we're going to take away people's property if they're of a particular religion, ethnicity, something of that sort, race. They are different. And the principle that we don't mess in your business because we don't want you to mess in our business, doesn't really hold when that happens, when a government chooses to, you know, have what I call the cash system. It's not the same thing, is it? It's not the same thing, but the question is, what has the law been? And that is not to run along. I understand that. We then have to look and see when in time we apply whatever this principle is. I'm not trying to get you to concede your client's case away, but as of today, you know, some action taken by government today, wouldn't you agree that there is an exception, there should be an exception, if there is in the Ninth Circuit for expropriations that are based on race, that say, you know, we're going to treat people of a particular color differently? Should be is a different question. That is, I agree. Well, in a sense, it's a different question, but it's only a different question if it's foreclosed by our precedents. If it's an open question, should be becomes something for us to decide. And the question is, we're talking about a statute here, the FSIA, and at some point what we need to be doing, not me necessarily, but what the court needs to be doing is interpreting what the statute means. And let me give you an example. In 1994, there was an amendment to cover exactly these kinds of events. It was limited to U.S. citizens, but there was a proposed amendment in the House of Representatives, and we have it in our brief, and the proponents of the amendment said, these kinds of events, Holocaust kinds of events, are not covered by the FSIA. That is, they're not accepted from the FSIA, and they should be. And the opponents said, we agree. These kinds of events are not covered, and for whatever reason, they shouldn't be. It passed the House, it failed in the Senate. But there was a recognition by at least one House of Congress that the existing statute did not cover these events, and there's been no subsequent amendment. So if what we're doing is interpreting a statute and trying to figure out what the statute meant, as opposed to what we would do if we were legislating, if we were legislating, there are lots of things we can do, but Congress has made the legislation here, not anybody else, and the legislation at the time didn't cover it. Now, for example... What would Scalia say? We know what Scalia would say. Interpreting, well, presumably... I would guess. Presumably, yeah, we can all guess. I mean, not that we're all Scaliaists in interpretation, but we're also influenced by his... I mean, you're asking us to interpret the statute passed 40 years ago by the partial action of a much later Congress. Well, I think Justice Scalia would say two things. One, he would say... You're saying Scalia. Mr. Saltman, you're crazy. We're not going to pay any attention to that post-legislative history. The second thing he would say is, it says, taken in violation of international law, and we know what that phrase means. I write books about it, and taken means taken at the time, and I may not like it, but I'm going to adhere to it. That's what Justice Scalia would say. So, six of one, half dozen of the other. Now, if you think that legislative history, and I mean legitimate legislative history, that is real action by Congress, not midnight insertions into the congressional record, if you think... Well, mine was a legitimate question, because this is obviously an action by Congress. It's a partial action by a different Congress, and I'm just truly not sure how much we can... And I use Scalia as a proxy for... But I think also what you have to remember is that there's a general rule that when Congress adopts a statute which codifies the common law, it accepts the common law. When it adopted the FSIA in 1976, there were no exceptions to the domestic takings rule. And so if you look at that, and then look at perhaps what happened in 1994, you can come up with a substantial argument that in interpreting the statute, which had no exceptions to it under the common law, that's what Congress intended. And if Congress wants to change that, they can obviously do that. So let's say we don't wish to create or exacerbate a conflict with the 7th and DC circuits. Let's say that argument doesn't apply for whatever reason. What is your next level argument? I'm sorry, I didn't hear the beginning. Let's say we don't want to create a split or exacerbate a split with the 7th circuit. Yeah, you wouldn't be creating a split. The split's there. Well... The 5th and 11th are enough for a split, too. Maybe we want to stay out of that fight. Okay, I guess. How do we get to where you want to go? Well, then there are two issues. One is sort of brand new and pending, but let me just mention that. The Supreme Court just granted certiorari last month in a case involving Venezuela over what the pleading standard is for the expropriation exception under the FSIA. It's case number 14-523. And... What's the name of it? Venezuela. Venezuela is in the name. That's very convenient. Something that precedes Venezuela. That's all right. Don't waste your time. I think our law clerks can dig it up with what you've heard. versus Bolivarian Republic of Venezuela. Okay. Should we hold our case for that? Well, if we're talking about a pleading issue, then you might want to consider holding it, because the U.S., the court issued a CVSG, and the U.S.'s position on cert was the position that the Ninth Circuit has taken, and it was argued here that we just need to make a non-frivolous allegation. The U.S. was not happy with that. They said flat out that the D.C. Circuit for adopting that was wrong. They didn't say what their test was going to be. Presumably that will come up on the merits. And you know how successful they have been in these cases before the Supreme Court. Well, the court granted cert on the only issue that the United States asked it to grant cert on after its views were solicited, and so, you know, we would have to see. Should we do the same here? Should we, well, see what the views of the United States... Well, I don't think you need to, and the reason you don't need to is the second issue, which is the political question issue. That is... Why do we have to reach the political question in order to determine jurisdiction? You don't have to reach the political question in order to determine jurisdiction. You have to reach the political question before you can determine the merits. And obviously, if you throw it out on jurisdiction, on FSIA jurisdiction, then you're done, but... When you say we have to reach the political question, are you saying even if there's no claim of an Armenian genocide, we have to reach the political question? I don't believe there's no claim of Armenian genocide, and the reason I don't, I know what the pleadings say, I know how this case has been presented, and the other thing I know is that there is no way, no way ever, to bring a hundred-year-old claim without finding some way past every statute of limitation has been known to man. And the way they get past the statute of limitations is to say it was a genocide, and here is some exception... I'm not saying that they took this property in trust, they have not been paying what they owe us, they refuse to give us an accounting, and that's a continuing violation... It's not a continuing violation. It's not a continuing violation under anyone's law. Under California law, under an open book account law, which oddly I happen to know about, it is four years from the last entry. There is no statute of limitations which doesn't ever run, and as Judge Kaczynski said, and if there were, it would be caught in latches in some way, there's no explanation for why between 1933, which is when the Turkish statute would have run, ten years after... which is the statute of repose, ten years after 1923, between 1933 and 2010, why wasn't a case brought? It's not because there was a genocide in 1915, it's not because the plaintiffs couldn't bring a case, most of them weren't born in 1933, and certainly weren't born in 1915. It's because their argument is, for some reason, because we claim there was a genocide, the statute shouldn't run. And the answer is, statutes do run, and their exception is, it shouldn't run because there was a genocide. And that's why you always will have to decide the genocide question. Putting aside the fact that there's a complaint with 24 references to genocide, and if you look at the other complaint, and if you look at the international law violation, what supposedly... oh, this is just a violation of international law, this is at ER 98, defendant, Republic of Turkey, directed and participated in a deliberate plan of forced deportation, confiscation and extermination, in furtherance of the commission of war crimes, crimes against humanity, crimes against peace, torture, rape, starvation, physical and mental abuse, summary execution, and genocide. That's in their... that's the first paragraph of their international law violation in the Du Bois case. Both of these are rife with that. There is no way these cases go anywhere, whether it's on statute of limitations or anything else. Was your motion to dismiss based on the statute of limitations? Yes, in part. All right. She didn't get... She didn't decide. She only decided the FSIA and the political question, and said she didn't need to decide anything else. We had a preemption issue, we had a comity issue... Well, can we reach the statute of limitations before deciding jurisdiction? I don't think you can reach it before deciding jurisdiction, but I think, you know, just in the normal order of things, you decide whether you have jurisdiction before you go to merits kinds of issues, and that's how it was argued, and that's how Judge Gee decided it. She decided not to decide the other issues, because she decided there was no jurisdiction under the Ninth Circuit's law with regard to political question, which is considered... But what I'm asking is, is it possible to get to the issue of statute of limitations without deciding the jurisdictional questions? Are you talking about just the FSIA jurisdictional question, or all of the jurisdictional questions? There are three. There's an FSIA jurisdictional question, there's a political question jurisdictional question, and there's a local action rule jurisdictional question. Take them all together. Can we reach the statute of limitations question without deciding those questions? I think you can. I think cases have. It's not normally the way it goes. Normally the way you do it is, do I have jurisdiction, and then I'll decide it. But I don't think it really matters here, because it all gets you back to the political question issue. You can say, how will I ever decide whether there's a political question here? Well, that is a question of whether there was an Armenian genocide and all of those issues. And you look at, and you say, we're going to have to decide that, because if we ever have to decide statute of limitations, which we would have to decide if we took jurisdiction, we would have to decide the same point. And I think, look, let's be, this law, political question law, and all this law, is very practical, and I think it's worth a minute talking about it. As Judge Wardlaw pointed out, we're talking about claims in which they're asking for, for example, for property back that is located on the Inderlich Air Force Base. The Inderlich Air Force Base is the only Air Force Base the United States has in the Middle East. It has 5,000 airmen, it has tactical nuclear weapons, it has Patriot missiles. It is used every day, almost every day, it was down for one day last week, to bomb ISIS in Syria. Are they asking for the return of that property? Yes. And are they also asking for damages if it's not returned? Yes, they are, but that's not the issue. That is, they are asking for return of the property, and the question is, how concerned is a NATO ally who owns the land that they're asking for, from which we operate in two theaters of war, and in which we satisfy our NATO obligations, is that a political question? If that's not a political question, there is no such thing as a political question. And there's no way to get around that. There's no deft way to dance and deal with the diplomatic issue that is certain to come about. So let's do a little bigger analysis. Yes. So what textual, constitutional provision gives it that question as to the relief regarding the property claims? Fair question. The issue here is a foreign affairs issue. And the constitutional commitment of the issue is here to the political branch, where the executive decides, and Congress to some extent decides, foreign policy. It is not to the judicial branch. I think we can all agree with that. So that's factor one. Factor four, under Baker, difficulty of resolving without disrespecting the sanctity of executive control over foreign policy. If you have to decide anything with regard to the genocide question, you are going to have that problem. We have a situation in which this is a bad neighborhood of the world, and bad things happen here, and the executive has made decisions about how it wants to go forward. And we can agree or not agree with those decisions, but those are decisions of great weight which need to be respected. And the executive has made these decisions in administrations for 25 years in both parties. There has been no debate. Suppose we ask the executive for their position, and they say we have no position on whether this is a political question. Well, if they say that, then you'll have to decide the issue. If they say, I have a feeling what they'll say, but they don't want to say very much if lawyers just ask them to, if judges ask them to, I think they're a little more persuaded to do it. But that obviously is fine with us if you want to ask the executive for its position. I think its position would be something that the court takes into account, whether it's a clear position, a non-clear position, but they're not going to do it unless... Required, sort of. The Air Force base argument only applies to one of the two. That's correct. That's correct. The Air Force base argument only applies to one of the two. But I read from the international law violation from the other complaint, and that also involves genocide. There's no way. If they came back and amended and took every reference to genocide or anything like it out, these cases wouldn't survive a minute. Well, they would say there's a violation of international law... But it isn't. ...without calling it genocide. Well, either we're playing a game, or what is the violation of international law? Because what Simon, if you accept the Simon analysis or the Abeles analysis, which we don't for the timing issue and the textual issue, but if you accept that, then there is no violation of international law except for the genocide violation, because every other international law issue gets covered by the domestic takings exception or the domestic takings rule. What they're trying to say is, oh, there's a domestic takings rule, but it never applies, because it only applies if you go get Mrs. Smith's house, and you don't pay her enough money. In short of genocide, there can be treatment of the domestic people. They're saying, for example, you can't say to blacks in this country, you don't have the same voting rights as other people. You've got to show 10 pieces of identification, and whites can show one piece, for example, if that were a bill. You can't own houses in certain areas. They're saying that there's something short of genocide that's a violation of international law. If you treat a certain class of citizens, don't give them the same rights. They're saying that would be a violation. But it isn't. They can say whatever they want, but it isn't. It is not a violation of international law as a general matter how a nation treats its citizens. If that were true, we would be in Russia, we would be in China, and we would be in court all the time. There is no violation of international law because we don't like how some nation treats its citizens because we don't want them to tell us the same thing. It's sort of that simple. The domestic takings exception is the embodiment that comes in the context of expropriation, and the reason it comes in the context of expropriation is because that is what normally affects foreigners. That's why you have debates over that. But if you look at the case in which the domestic takings rule stemmed from, Justice Marshall's case in 1812, the Schooner something or other, and God knows I never thought I would be citing Justice Marshall in 1812, but if you look at that case, that's the start of the domestic rule. And he says, We don't tell foreign nations what to do as to their citizens in the foreign nation. And that goes out, and we have Ogin, and I think it's Rakal in 1918, we have Belmont, we have a whole line of cases in which the general rule is we don't interfere with what other nations do and what plaintiffs are arguing for. And then there was, in these two cases, in the last 200 years, in these two cases, they persuaded, in the context of the Holocaust, in the 1940s, they persuaded the courts in Simon and Adelaide, said, Now there should be an exception for genocide. But that doesn't mean that the rule doesn't otherwise apply. The exception for genocide from the domestic takings rules is an exception from the domestic takings rules. It is not an entirely, it does not mean that anything you don't like, you say is an international law violation because it happened over there. I think you have explained your case very well, and you have plenty of time. I have. Thank you very much for all the time. Thank you. We will, you will have a total of five minutes to figure out how to split it. All right. Thank you. Mark Davis again. Just in response to the two, two of the points, I'm not aware of any cases where the court does not have to determine jurisdiction before statute of limitations whether it is on an alien torts, FSIA or anything else, number one. Number two, he did it again. When I say he did it again, he read from our complaint. He read all of the violations. It was a string, basically 10 or 11 violations of international law. And then it said, and genocide. If you strike and genocide, mass torture, the enslavement, everything else are all, you could just take them off. They're all violations of international law. As far as the political question, we can stand up and we can grandstand that the issue of this is a bad neighborhood and this is a theater and this or that, the FSIA is clear on its terms. And as I, I think the court has already recognized the seventh and the DC. What does mass torture have to do with taking? Well, generally I would think that they can go hand in hand. If you have a generally, when you go to torture somebody, whether absent doing it in their house, if you round them up and take them out of their property, generally, that's what mass torture is. And that's generally when we do get involved. Well, but you have mass torture without expropriation. You can have expropriation without mass torture. Well, unless you're going to go in and torture people in their houses and leave them in the house and leave the house there, that would, I mean, I don't think that happens that often. My experience, and at least in reading history, is that generally when you do mass torture, that ends in mass graves. And that's generally not in the backyard of your own house. The experience that, at least the historical experience I have. This is a violation of international law without the necessity of genocide. Correct. And you would want to add to the exceptions that have already been created. No, I think the exceptions are already there. It says violations of international law and to answer the question you asked, was the Holocaust in 1915. I will tell you what happened in 1915 to the Armenians was well documented in real time by our state department, by our ambassador, Morgenthau, and there are zillions of documents contained in the record that we can show at the time there was a violation of international law. And it was characterized as that on the front page of the papers and in the museums and the libraries of Congress. So we don't have to imagine taking the Holocaust and putting it in retrospectively, putting it into 1915 because we have Ambassador Morgenthau documenting it in real time history to the U.S. government. We have in real time history the ambassador from Turkey coming to the U.S. talking about it at the same time and we have real time documents and evidence that we can present. And frankly, I think if you look at Judge Gee's order, she alludes to that as well. Thank you. Just to respond to Mr. Saltman's point that the Ninth Circuit has settled the domestic takings exception as a rule in the circuit, we would disagree with that and stand on Judge Gee's analysis and reasoning in which she looked at each one of the cases in which this has been decided, these questions. And nothing has been settled as far as domestic takings. This is the first time that the court has to address head-on whether or not Yuskovin's crimes, crimes against humanity that are pled in these complaints are an exception to the domestic takings rule under the FSIA. And we ask that you affirm Judge Gee's finding on that point and also to not depart from the D.C. Circuit for Judge Srinivasan's decision in Simon or in the Seventh Circuit Avala's case, but to find jurisdiction exists. As far as the political question, Doctor, and we ask your honors to go through the Baker factors. Judge Gee did not do that. Rather than to viscerally respond to cases that touch on foreign affairs, no matter how polarizing they might be, not all questions that touch on foreign affairs are political questions that must not be justiciable. And we ask that you remand for findings on statute of limitations that are appropriate at the trial court level. Thank you. Thank you very much. Thank you all very much for a most interesting argument. The case will be taken under submission, and the court will stand in recess for the day. All rise.
judges: Reinhardt, Kozinski, Wardlaw